**In re PETTIBONE CORPORATION, a Delaware corporation, et al., Debtor.**

**Bankruptcy Nos. 86 B 1563–86 B 1571.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Jan. 23, 1990.

James J. Hickey, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, Ill., for Allied Corp.

Martin N. Fealk, Provizer, Lichtenstein, Pearlman & Phillips, P.C., Southfield, Mich., Robert D. Kolar, Robert D. Kolar & Associates, Chicago, Ill., for Granite State Ins. Co.

David B. Lowe, Winston & Strawn, Chicago, Ill., for debtor.

James C. LaForge, Chadbourne & Parke, New York City, Marilyn I. Kosin, Towbin & Zazove, Ltd., Chicago, Ill., for Rockwell Intern. Corp.

Gloria E. Block, Chicago, Ill., for James & Jeannie Carter.

Ronald L. Futterman, Hartunian, Futterman & Howard, Chicago, Ill., for the PL Committee.

John H. Ward, Much Shelist Freed Denenberg Ament & Eiger, P.C., Chicago, Ill., for Unsecured Creditors Committee.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTIONS OF ROCKWELL INTERNATIONAL CORPORATION AND ALLIED–SIGNAL, INC. TO FILE LATE PROOFS OF CLAIM

JACK B. SCHMETTERER,
Bankruptcy Judge.

This contested matter came on for trial on the Motions of both Rockwell International Corporation ("Rockwell") and Allied–

Signal, Inc. ("Allied–Signal") (collectively "Movants") to File Late Proofs of Claim. Evidence was admitted and considered along with the argument of counsel. The Court now makes and enters the following Findings of Fact and Conclusions of Law. To the extent the same are contrary to objections filed thereto, those objections are overruled. Findings and Conclusions requested but not entered were deemed inappropriate, erroneous, or unnecessary for purposes of ruling. An order will enter this date granting Movants' Motions to File Late Proofs of Claim.

## FINDINGS OF FACT

1. On October 18, 1985, John and Lisa Reichert (collectively, the "Reicherts") commenced a products liability type action against Pettibone Corporation ("Pettibone"), Pettibone Texas Corporation ("Pettibone Texas") and Sabine Machinery Company ("Sabine"), as Case no. 14605, in the District Court of Morris County, Texas (the "Texas PL Action"). The complaint alleged that John Reichert had been injured in an accident on July 17, 1985 involving a forklift and sought to recover damages allegedly sustained in that accident. The forklift (hereinafter the "Forklift") involved in the accident was alleged to have been designed and manufactured by Pettibone.

2. Granite State Insurance Company ("Granite") is the first layer excess insurance carrier for Pettibone and its affiliates and subsidiaries (collectively the "Pettibone Entities") for all product liability claims filed against the Pettibone Entities during the policy period beginning October 22, 1984 and ending October 22, 1985. The Texas PL Action falls within this policy period. Granite State's liability policy, No. 6684–1708 provides coverage to the Pettibone Entities for up to $5 million dollars of "ultimate net loss" as defined in the policy.

3. On October 21, 1985, the Reicherts filed their First Amended Original Petition in the Texas PL Action.

4. On December 5, 1985, the Reicherts filed their Second Amended Original Petition in the Texas PL Action which added Detroit Diesel Allison, a division of General Motors Corporation ("Detroit Diesel") as a defendant. The Second Amended Original Petition alleged that Detroit Diesel provided a defective and negligently designed transmission that was used in the Forklift.

5. On January 31, 1986, the Pettibone Entities filed voluntary petitions in bankruptcy under Chapter 11 of the Bankruptcy Code in this court.

6. On June 16, 1986, the Texas Employers Insurance Association (the "Association") filed an unliquidated proof of claim against Pettibone on behalf of John Reichert. That claim was based on the injuries John Reichert allegedly sustained in the July 17, 1985 accident.

7. On June 24, 1986, John Reichert filed an unliquidated proof of claim against Pettibone Texas based on the injuries John Reichert allegedly sustained in the July 17, 1985 accident.

8. Also on June 24, 1986, Lisa Reichert filed an unliquidated proof of claim against Pettibone related to the damages allegedly resulting from the July 17, 1985 accident involving her husband.

9. The claims of John Reichert and the Association were docketed on the Pettibone Texas Claim Docket as Claim Nos. 7 and 8 respectively.

10. In August of 1986 this court set October 31, 1986 as the last day by which all creditors were to file proofs of claim (the "Bar Date"). In September of 1986 the Pettibone Entities caused to be mailed written notice of the claims Bar Date to certain entities, including Rockwell and Allied–Signal. Both Rockwell and Allied–Signal filed proofs of claim before the Bar Date for amounts owed to them pursuant to commercial transactions with certain of the Pettibone Entities.

11. On February 22, 1987, approximately four months after the Bar Date passed, the Reicherts filed their Third Amended Original Petition in the Texas PL Action. This amended original petition added Rockwell, and certain corporate predecessors to Allied–Signal (collectively referred to as "Allied–Signal"), as defendants in the Tex-

as PL Action. The Reicherts' Third Amended Original Petition alleged in part that the Forklift contained a brake assembly manufactured by Rockwell and a treadle assembly and brake valve manufactured by Allied–Signal. The petition also alleged:

> The Pettibone machine additionally contained a power brake assembly that was an integral part of the Pettibone Machine's braking system. Such brake assembly was designed and manufactured by Rockwell.... The brake assembly was defectively designed at the time it was placed in the stream of commerce by [Rockwell] and at such time was unreasonably dangerous as designed.

It was further alleged that the "design, manufacture, and marketing of the machine in question with the [Allied–Signal] brake valve and treadle assembly constituted negligence on the part of said Defendants in that the machine was unsafely designed and unreasonably dangerous, and the machine failed to contain adequate warnings and instructions for safe use...."

12. Upon review of Reicherts' Third Amended Original Petition, counsel for Rockwell and Allied–Signal were aware of the possibility of potential cross-actions against Pettibone and Pettibone–Texas, but the specific facts upon which the Reicherts' claims against Rockwell and Allied–Signal were based were not known. Rockwell's counsel also reviewed the discovery materials that had been exchanged by the original parties to the Texas PL Action. Among these materials were references to Pettibone–Michigan and Pettibone's plant in Baraga, Michigan.

13. In late March of 1987 both Rockwell and Allied–Signal filed answers in the Texas PL Action in the form of general denials.

14. In May of 1987 Granite and the Pettibone Entities were considering entering into a "Step–Up" Agreement under which Granite would undertake the defense of the product liability actions against the Pettibone Entities up to its policy limit of $5 million. A letter from Granite's counsel on May 11, 1987 explained that a key advantage of entering into the Step–Up Agreement was that it minimized the possibility that Granite would have to pay all or part of the Pettibone Entities' underlying liability limits of $2.2 million (consisting of $1.5 million in self-insured retention and $.7 million of primary insurance from Northumberland General Insurance Company which was insolvent). The letter also indicated that it appeared "very likely that total payouts for the claims in the policy year [would] exceed [Granite's] $5,000,000 ultimate net loss." Rockwell Ex. 57 at 2.

15. On June 8, 1987, the state court Judge granted the Reicherts' motion to sever Pettibone and Pettibone Texas as defendants in the Texas PL Action because of their bankruptcy filings. That court allowed the Reicherts to proceed against the remaining defendants.

16. In June of 1987, a physical inspection of the Forklift was made in an attempt by Rockwell's counsel to determine whether the Forklift contained any components that were manufactured or designed by Rockwell. The inspection revealed that Rockwell components were on the Forklift.

17. On July 17, 1987, Allied–Signal filed a cross-action for contribution and indemnity in the Texas PL Action against Pettibone, Pettibone–Texas, Detroit Diesel and Rockwell. William C. Gooding, Allied–Signal's attorney defending the Reichert suit, testified that this cross-action was brought in order to protect Allied–Signal's rights should it be determined that this was the last day of the statute of limitations period for filing an action arising from the personal injuries suffered by John Reichert. Pettibone and Pettibone–Texas were joined in the cross-action inadvertently because they had been severed on June 8, 1987.

18. In September, 1987, Rockwell propounded its first set of interrogatories to the Reicherts in the Texas PL Action. Those interrogatories sought in part a detailed description of each component part of the Forklift alleged to be defective, and a list of the expert witnesses the Reicherts intended to call.

19. On November 23, 1987 the Pettibone Entities and Granite executed the "Step–Up" Agreement. The preamble to the Step–Up Agreement provides in part: "[w]hereas, product liability lawsuits and claims ... have been filed or otherwise asserted or *may be filed* or otherwise asserted against [the Pettibone Entities] by certain known and *unknown parties,* with respect to which [claims] Insurer may be or become obligated under the Policy...." (emphasis added.)

20. Granite's underwriting managers, C.V. Starr & Co., relied on its attorney to look at the actual claims filed. Granite's counsel, however, did not independently check the claims docket. Rather, Granite's counsel relied on the material provided by the Pettibone Entities. Granite's review prior to entering into the Step–Up Agreement consisted solely of a review of files maintained by the Pettibone Entities and other miscellaneous information supplied by the Pettibone Entities.

21. Granite did not make a qualitative review of the proofs of claim prior to entering into the Step–Up Agreement. The information supplied by the Pettibone Entities gave some information as to damages sought by claimants, but not enough to draw a conclusion about potential aggregate damages. The first qualitative review of the proofs of claim was done by Robert D. Kolar's office in January or February, 1989. In the light of its financial reason for entering into the Step–Up Agreement (Finding No. 14), Granite would have entered into it even if Movants had earlier filed their claims in this bankruptcy case. Granite did not rely on the failure of Movants to file their claims herein, nor did Granite suffer prejudice or detriment from the late filings by Movants.

22. On February 19, 1988 the Reicherts responded to Rockwell's September 1987 interrogatories, but explained that they were unable to answer the questions propounded at the present time because discovery was just commencing.

23. In June, 1988, another physical inspection of the Forklift was attended by Rockwell, Allied–Signal and other parties because the Forklift was about to be placed back in service by John Reichert's employer. At this inspection John Reichert's employer operated the Forklift. Defendants' representatives were not allowed to operate the Forklift or disassemble the machine to inspect its component parts.

24. Throughout this period Rockwell's attorneys had informal contact from time to time with Reichert's counsel to encourage responses to Rockwell's discovery requests, but did not seek formal enforcement of those requests in court.

25. On September 21, 1988, Kelly Lewis and David Shuler, co-workers of John Reichert, were deposed. Lewis and Shuler testified that they were working with John Reichert at the time of the accident and that Lewis was operating the Forklift when John Reichert was injured. Lewis testified that the transmission controls may have been in a position which allowed him to accidentally knock the Forklift into gear, and that it was possible that the transmission vibrated into gear.

26. Shortly after September 21, 1988, Rockwell filed a cross-claim in the Texas PL Action. This action was taken in response to the Reicherts' counsel's announcement at the September 21, 1988 depositions of Lewis and Shuler that he would attempt to have the Texas PL Action trial begin during November, 1988. The inclusion of Pettibone and Pettibone Texas in this cross-claim was inadvertent because Pettibone and Pettibone Texas were no longer parties to the Texas PL Action at that time. They had previously been severed on June 8, 1987, fifteen months earlier, and in September of 1988 were still protected by the automatic stay in bankruptcy.

27. On October 5, 1988, Rockwell's counsel was informed that George Greene ("Greene") and Lanny Rhoades ("Rhoades") were to be Reicherts' expert witnesses.

28. On October 10, 1988, Greene was deposed. At his deposition, Greene stated that in his opinion Rockwell was "instrumental" in specifying the braking system to be used on the Forklift. He also said

that the braking system should have included spring brakes and/or other safeguards to act as a fail-safe system. Greene also explained that the scope of Rockwell's recommendation would depend on the nature of Pettibone's request. This testimony provided Movants with greater information than they previously had respecting the existence of a possible cross-action against the Pettibone Entities.

29. On October 25, 1988, Rockwell filed a motion seeking leave to file an unliquidated proof of claim against "Pettibone Corporation and its related entities" for contribution and indemnification arising from the Texas PL Action. Rockwell also moved to modify the automatic stay imposed by 11 U.S.C. § 362(a). That motion's caption refers to Pettibone, Pettibone Texas, and "seven consolidated cases," although the text of the motion is addressed only to Pettibone and Pettibone–Texas.

30. Rhoades was deposed on November 14, 1988. Approximately two weeks later, on November 29, 1988, Allied–Signal filed a motion for leave to file a general unsecured claim against the Pettibone Entities for contribution and indemnification arising from the Texas PL Action.

31. On December 9, 1988, this Court entered an order confirming the Pettibone Entities' Second Amended Plan of Reorganization ("the Plan") effective as of December 27, 1988. The Plan included a schedule which listed the Pettibone Entities' tort claimants. It did not list or identify the timely filed and docketed claims of John Reichert, Lisa Reichert or the Association.

32. On December 16, 1988, pursuant to Section 7.05(a) of the Plan, this court modified the automatic stay provided by 11 U.S.C. § 362(a), and the injunction provided by 11 U.S.C. § 524, in order to allow Rockwell and Allied–Signal to proceed against Pettibone and Pettibone Texas in the Texas PL Action.

33. Since confirmation of the Plan, Granite has been defending product liability claims against the Pettibone Entities for the involved policy year, including the Reichert claim.

34. On January 17, 1989 Granite filed a response to Movants' motions for leave to file late claims. Granite's response stated in part: "Based upon a review of the cases for which a Proof of Claim has been filed for the involved policy year it appears probable that the totality of all claims, when liquidated through settlements and judgement will exceed $7,100,000 (the sum of the underlying limit and Granite State's limit). Rockwell Ex. 40.

35. In February of 1989, the state court Judge reconsolidated the Reicherts' previously severed claims against Pettibone and Pettibone–Texas in the Texas PL Action with the Reicherts' claims against Rockwell, Allied–Signal and the other defendants.

36. On June 28–30, 1989, Ray McDonald ("McDonald"), a former Pettibone Michigan employee, was presented for his deposition in the Texas PL Action. McDonald testified that Pettibone designed and manufactured the brakes for the Forklift in Chicago and shipped them to Pettibone Michigan in Baraga, Michigan. McDonald also testified that the Forklift had been generally designed and manufactured by Pettibone Michigan, a separate corporate entity from Pettibone.

37. Shortly after the McDonald deposition, in July of 1989, Rockwell filed a motion in the Texas PL Action for leave to join Pettibone Michigan as a third-party defendant in that case, subject to this court modifying the injunction occasioned by 11 U.S.C. § 524.

38. On July 12, 1989, Movants each filed Amended Motions for Leave to File Late Proofs of Claim against the Pettibone Entities for contribution and indemnity arising from the Texas PL Action. Although Movants' prior motions (October 25, 1988 and November 29, 1988) had sought leave to file late proofs of claim against the Pettibone Entities collectively, the amended motions specifically named Pettibone Michigan.

39. Also on July 12, 1989, and pursuant to Section 7.05(a) of the confirmed Plan, Rockwell served its motion for a modification of the injunction under 11 U.S.C. § 524

as to Pettibone Michigan so that Rockwell's claims against Pettibone, Pettibone Texas and Pettibone Michigan could be simultaneously liquidated in the Texas PL Action.

40. On July 14, 1989, the state court Judge granted Rockwell's and Allied–Signal's pending motions for leave to file a third-party petition against Pettibone Michigan in the Texas PL Action. Until Rockwell and Allied–Signal joined Pettibone Michigan in the Texas PL Action, Pettibone Michigan was not a party to that lawsuit.

41. In July of 1989, Judge Thomas James of this court (sitting in absence of the undersigned due to illness) granted Rockwell's and Allied–Signal's motions to modify the 11 U.S.C. § 524 injunction as to Pettibone Michigan.

42. In July of 1989 the Reicherts amended their petition to assert claims directly against Pettibone Michigan.

*Facts Related To The Carters' Objection*

43. The Carters are Class 3 creditors who have filed an objection to Movants' motions to file late claims. Class 3 under the confirmed Plan is composed of those creditors asserting product liability claims against the Pettibone Entities.

44. No other Class 3 creditor for the 1984–85 Policy Year has come forward to object to Rockwell's Amended Motion.

45. The Class 3 Creditors Committee and the Unsecured Creditors' Committee (for Class 4 claimants) have withdrawn their objections to Rockwell's Amended Motion.

46. The Plan was accepted by the Class 3 creditors within the meaning of 11 U.S.C. § 1126(c).

47. The Plan would have been accepted within the meaning of 11 U.S.C. § 1126(c) by the Class 3 creditors, even if the Carters had voted to reject the Plan. *See* Rockwell's Ex. 32, 52.

48. Any facts stated in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### I. Motions to File Late Claims

1. Subject matter jurisdiction over this matter exists under 28 U.S.C. § 1334(b). This is a core proceeding within 28 U.S.C. § 157(b)(2)(B) (allowance and disallowance of claims).

2. Bankruptcy Rule 3003(c)(3) authorizes the bankruptcy court to establish a bar date and contemplates that the court may in certain circumstances extend that date. The rule states that "[t]he court shall fix and *for cause shown* may extend the time within which proofs of claim ... may be filed." (emphasis added).

3. The Seventh Circuit has explained that a bar date in a reorganization case provides a mechanism by which a trustee in bankruptcy can estimate the potential liabilities of the debtor. *In re Chicago, Rock Island & Pacific Railroad Co.*, 788 F.2d 1280, 1281 (7th Cir.1986). This estimate is essential to formulating a viable plan of reorganization. Id. *See also In re Arrow Air, Inc.*, 75 B.R. 375, 378 (Bankr.S.D.Fla. 1987) ("an essential purpose of setting a claims deadline ... is to fully inform participants in the reorganization process as to the debtor's liabilities" so that "[a]rmed with this knowledge, proposals may be evaluated with confidence, and negotiations may proceed without being hindered by undue caution or skepticism.").

4. In evaluating whether a late claim should be permitted under Rule 3003(c)(3), Bankruptcy Judges in this jurisdiction, as well as other jurisdictions, have considered the following factors: (i) the reason for the delay; (ii) the length of the delay; (iii) whether the debtor was prejudiced by the delay; (iv) the debtor's knowledge of the claim; and (v) the good faith of the creditor.[1] *In re Jartran, Inc.*, 76 B.R. 123, 126 (Bankr.N.D.Ill.1987); *In re Lester Witte & Co.*, 52 B.R. 436, 438 (Bankr.N.D. Ill.1984). *See also Collier* ¶ 3003.05[4] at 3003–12 (also discussing the propriety of penalizing a client for attorney error).

1. Granite concedes that there is no bad faith on the part of Movants in this case.

5. When construing the phrase "for cause" in the context of determining whether claims filed after the bar date should be allowed, some courts in other jurisdictions have found that Rule 3003(c)(3) must be read in conjunction with Bankruptcy Rule 9006(b). *See, e.g., In re Vertientes, Ltd.,* 845 F.2d 57, 59 (3rd Cir. 1988); *In re South Atlantic Financial Corp.,* 767 F.2d 814, 817 (11th Cir.1985), *cert. den.,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986). *Compare Maressa v. A.H. Robins Co., Inc.,* 839 F.2d 220, 221 (4th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 76, 102 L.Ed.2d 53 (1988) (suggesting that Fed.R.Civ.P. 60(b)(1) should be applied to determine if an untimely filing should be permitted). Rule 9006(b) provides in part that "when an act is required ... within a specified period ..., the court for cause shown may at any time in its discretion ... (2) on motion made after expiration of the specified period permit the act to be done where *the failure to act was* the result of *excusable neglect."* (emphasis added). In *South Atlantic,* the Eleventh Circuit explained that "[c]ourts have been most willing to find excusable neglect where the movant failed to comply with the bar date because, through no fault of its own, it had no notice of that date." 767 F.2d at 817–18 (citations omitted). *See also Arrow,* 75 B.R. at 377 (citing *South Atlantic,* for the proposition that excusable neglect "means the failure to act was due *solely* to matters beyond the movant's control.") (emphasis added); *In re Figueroa,* 33 B.R. 298, 301 (Bankr.S.D.N.Y.1983) ("excusable neglect" in Bankruptcy Rule 9006(b)(2) requires the moving party to show that the failure to comply with the deadline "was due to something more than ordinary negligence; it must have been something that would not have been prevented by diligence.").

6. The significance of incorporating Rule 9006 into the Rule 3003(c)(3) analysis is its impact on the weight, if any, to be given to "prejudice" as a factor to consider in assessing whether a late claim should be permitted. In *South Atlantic,* the Eleventh Circuit noted that Federal Rule of Civil Procedure 6(b)(2) also uses the term "excusable neglect" and then relied on precedent construing that rule to inform its reading of Bankruptcy Rule 9006(b)(2).

> Both [Bankruptcy Rule 9006(b) and Federal Rule of Civil Procedure 6(b)(2)] extend the time for the doing of an act where "the failure to act was the result of excusable neglect." *It is clear from this language that the focus of these rules is on the movant's actions and their reasons for those actions, not on the effect that an extension might have on the other parties' positions.*

767 F.2d at 818–19 (emphasis added). Accordingly, the Eleventh Circuit asserted that the prejudice to the debtor, its shareholders or its creditors "was not ... a relevant inquiry." The Eleventh Circuit cited two cases where prejudice was considered, but did not otherwise address the numerous courts that have followed the multi-factor approach used in this district.

7. Other courts have explicitly rejected this approach. *See, e.g., In re Terex Corp.,* 45 B.R. 290 (Bankr.N.D.Ohio 1985), and cases cited therein. The *Terex* court explained:

> Rule 3003 deals specifically with the filing of proofs of claim in a Chapter 11 case. Rule 9006 deals with the computation of time within which an act must be performed in a general fashion. The general rule must yield to the specific; otherwise Rule 3003(c)(3) would become a nullity.

One commentator suggests that the considerations under Rule 3003(c)(3) include excusable neglect but are broader, stating that "the standard to be applied by the court is not simply the standard of excusable neglect." 8 King, *Collier on Bankruptcy* ¶ 3003.05[4] at 3003–11 (15th ed. 1989). *See also In re Herd,* 840 F.2d 757, 758 n. 2 (10th Cir.1988) (noting the conflict between the two positions). For the reasons discussed below, this court will employ the multi-factor test previously used by other Bankruptcy Judges in this district, under which "prejudice" is one of the

factors to be considered in the analysis.[2]

### a. Reasons for the Delay

■ 8. The facts in this case are atypical. Movants acknowledge that they had notice of the Pettibone Entities' October 31, 1986 bar date due to unrelated commercial transactions with the Pettibone Entities, but the bar date passed before Movants were named as defendants in the Reicherts' Third Amended Original Petition on February 27, 1987. Granite concedes that Movants could not have filed a proof of claim arising from the Texas PL Action for indemnification or contribution against the Pettibone Entities before the bar date. *See, e.g., In re Hudson Oil Co., Inc.*, 100 B.R. 72, 78 (Bankr.D.Kan.1989) ("cause" to file a late claim exists where bar date has passed before the creditor knows of the existence of the claim). Granite contends, however, that Movants had an obligation to file their proofs of claim within a reasonable time and that the approximately 20 month period between when Movants were served with the Reicherts' Third Amended Original Petition and the time they moved for leave to file their proofs of claim for contribution and indemnification was too long. Specifically, Granite asserts that "[Movants'] attorneys, whether litigation counsel, national oversight litigation counsel, corporate counsel or otherwise, failed to act within a reasonable time after being brought into the [Texas PL Action] to file a proof of claim to preserve their contribution rights." Granite Br. at 10. At trial, Granite's counsel stated that a reasonable time for Movants to have filed their proofs of claim would have been in July of 1987.

9. The parties have devoted a substantial amount of effort to the issue of when exactly Movants had sufficient knowledge to file their proofs of claim for indemnification and contribution. Granite essentially asserts that this possibility should have been recognized as soon as Movants saw that they were named as co-defendants with some of the Pettibone Entities in a case arising from an accident involving a Pettibone forklift. Movants counter that they did not have a sufficient basis to file a proof of claim until after the deposition of the Reicherts' experts, Greene and Rhoades, in October and November of 1988.

10. Movants' counsel in the Texas PL Action, while sensitive to the legal possibility of filing a cross-claim, was not fully cognizant that a viable cross-claim existed at the time they received the Third Amended Original Petition and for a substantial time thereafter. However, the key fact was not the potential merit of the cross-claim, but rather the failure on the part of Movants' counsel to perceive that any deadline was imminent. When such a deadline was perceived, Movants' counsel took action. This is demonstrated by the fact that Allied–Signal's counsel did in fact file a cross-action against the co-defendants on July 17, 1987, the very day he perceived that the applicable statute of limitations might elapse. Similarly, upon learning that the Reicherts' counsel intended to have the case proceed to trial in November of 1988, Rockwell's counsel filed a cross-claim on September 21, 1988. This was before either Greene or Rhodes was deposed.

11. Movants' counsels' conduct was not unique; rather, it is the way litigation is frequently conducted. It often makes sense from the client's perspective for its counsel to refrain from undertaking activities until they must absolutely be done in hope that a settlement might be worked out. In contrast to the events that sparked Movants to file their cross-actions, there was no fixed deadline at that time to induce and spark action, although arguably the

---

2. Granite and Movants have agreed that Movants have the burden under Rule 3003(c)(3) to move for permission to file a proof of claim within a reasonable time. The parties also all agreed in response to a direct inquiry from the bench at trial that a laches concept should govern the question of prejudice if that is a relevant factor. However, Granite's brief specifically argues that a late claim may be barred even if no prejudice occurs and directs the court to authority on this point. The laches doctrine requires both an unreasonable delay by the claimant and a detrimental change in the position of the party asserting laches as a result of that delay. *Zelazny v. Lyng*, 853 F.2d 540, 541 (7th Cir.1988).

severance of Pettibone and Pettibone–Texas due to the bankruptcy should have alerted Movants' counsel to the need to take action. The tendency to take action only in response to a fixed deadline coupled with a lack of sensitivity about the effect and requirements of bankruptcy substantially explains the Movants' delay.[3]

12. This court finds unpersuasive Movants' arguments that they were prohibited by Bankruptcy Rule 9011 from filing proofs of claim against the Pettibone Entities earlier than they did. The Seventh Circuit has explained that "[e]ven though there is no fee to file claims in bankruptcy, the opportunity costs of the time needed to investigate and decide whether to file may be substantial, especially because Bankruptcy Rule 9011(a) (a parallel to Fed.R. Civ.P. 11) requires every claimant to investigate the facts and do necessary legal research before filing." *In re American Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988) (emphasis added). Even assuming that Movants did not immediately file their proofs of claim for indemnification or contribution because they felt constrained by the obligations imposed by Bankruptcy Rule 9011, they could have always moved immediately under Rule 3003(c)(3) for an extension. Such motions could have simply stated that they had a possible claim and that proofs of claim would be filed if and when follow-up investigation indicated that they were warranted. In short, Movants could not have filed their claims by the claims bar deadline, but could have filed them months earlier than they offered to do so or at least sought extension of time to do so.

### b. Prejudice

13. As previously discussed, a principal purpose for establishing a bar date is to facilitate development of a plan. *Chicago, Rock Island*, 788 F.2d at 1281. As discussed, notwithstanding the bar date's underlying purpose, some courts have ruled that absence of prejudice to debtor does not preclude a court from denying a motion to file a late claim. *See, e.g., In Matter of Robintech, Inc.*, 863 F.2d 393 (5th Cir. 1989); *Vertientes*, 845 F.2d at 60; *South Atlantic*, 767 F.2d at 818–19. This is true even under the multi-factor test. *Jartran* 76 B.R. at 126.

14. Efforts to file late claims involve inadvertence on the part of creditor or its counsel. Typically, the debtor properly gave actual notice of the bar date to a known creditor who then fails to file a timely proof of claim despite knowledge of the claim. *See, e.g., South Atlantic*, 767 F.2d at 818 (discussing cases). Strict enforcement of the bar date in this situation follows from the language of the rule which requires "cause," and is essential for the system to operate efficiently. It takes time and resources to evaluate late claims. Accordingly, the bar date in that circumstance must have bite independent of any prejudice to the debtor.

15. This does not mean, however, that prejudice should never be incorporated into the analysis. The facts in this proceeding are distinguishable from the typical case where a party moves to file a late claim. Although Movants had received notice of the Pettibone Entities' bar date for other transactions, Movants were not added as co-defendants in the state court action until four months after the bar date here had elapsed. Further, Movants' claims are contingent claims for contribution and indemnification. In this circumstance, the question of whether Movants' delay before moving to file late claims prejudiced the Debtor is significant.

16. The case most similar is *Hudson Oil*, 100 B.R. 72. There a landlord who had timely filed a proof of claim related to the rejection of the lease by the trustee later learned *after* the bar date of her possible claim against the debtor/tenant for contamination of the leased property. The court granted the landlord's motion for leave to file a late claim even though over two years elapsed from when the landlord learned of the possible claim until she filed

---

**3.** This lack of sensitivity to the problems raised by the bankruptcy is perhaps best illustrated by the fact that although Pettibone and Pettibone–Texas had been severed from the Texas PL Action because of the bankruptcy, both Allied–Signal's and Rockwell's counsel inadvertently named them as cross-defendants in their cross-actions.

her motion. The court specifically emphasized that it would typically find such a delay fatal, but that in the case before it the delay did not impact the administration of the case, there was no prejudice to the debtor or the trustee from the delay, and the "equities" of the case strongly favored movant. Id. at 78–79. Specifically, the debtor/tenant was required under the lease to provide insurance to cover such a contingency but had failed to do so. Id.

17. The authority cited above addresses prejudice to the debtor resulting from a creditor's delay in filing its claims. At trial, Douglas Johnson, general counsel for Pettibone, testified that the adverse impact on the reorganized Pettibone from allowing Movants' late claims for indemnification/contribution include: (1) the opportunity cost to Pettibone of making its employees available for depositions and complying with other discovery; (2) damage to the reputation of both the company and specific model of forklift involved in the lawsuit, variations of which are still being sold; and (3) the resulting difficulty in obtaining insurance until its claims history is resolved. The asserted impact of all three of these factors, however, is substantially mitigated by the fact that certain Pettibone Entities are named defendants in the Texas PL Action. Accordingly, whether or not the instant late claims are filed, Pettibone will have to comply with discovery, combat the adverse publicity attending the accident, and negotiate for insurance under essentially the same conditions. Movants' claims are for potential indemnification/contribution, and the incremental difference added by Movants' claims with respect to each of these three factors is not significant. Moreover, Pettibone has previously conceded "that it does not have any financial interest in opposing Rockwell's and Allied's motions." Pettibone Entities' February 1, 1989 Statement of Position at 2.

18. In addition, there was no evidence presented that Pettibone was hindered in formulating its plan of reorganization by Movants' delay in filing their claims. The Pettibone Entities had knowledge of the underlying Texas PL Action through the proofs of claim filed by the Reicherts' themselves. Further, Movants' motions for leave to file their late claims were filed before the Plan was confirmed. Finally, there has been no delay in making distributions to the product liability class members because these claims are just now being liquidated.

19. Granite truly relies primarily on purported prejudice to it, not to the Pettibone Entities, resulting from the Movants' delay. Even assuming that the impact on Granite, the Pettibone Entities' insurer for the Texas PL Action, is pertinent, Granite was not prejudiced by the delay. Even if Movants had filed their proofs of claim immediately upon being named as co-defendants in February of 1987, Granite would still have entered into the Step–Up Agreement. The language of the agreement clearly contemplates and Granite clearly assumed the possibility of unknown claims. In addition, Granite entered into the Step–Up Agreement without independently reviewing the Pettibone or Pettibone Texas claims dockets or comprehensively investigating the status of the various claims. Granite also continued forward with the Step–Up Agreement without complaint even after the Movants filed their motions for leave to file late claims. Finally, there is compelling evidence that Granite's five million dollar policy amount will be exhausted regardless of whether Movants' claims are allowed or not.

20. The final factor to consider is the impact of § 502(e)(1)(B) and § 502(e)(2) on the Movants' motion. As discussed below, these provisions serve essentially to defer allowing claims for reimbursement until they are no longer contingent. Once such a claim is no longer contingent, § 502(e)(2) permits it to be allowed as a pre-petition claim. 11 U.S.C. § 502(e)(2). If as here the plaintiff seeks recovery from both the debtor (Pettibone Entities) and a third party and has filed a proof of claim against the debtor, the failure to file a timely contingent claim for reimbursement is unlikely to be prejudicial. As discussed below, the contingent claim is disallowed under 11 U.S.C. § 502(e)(1)(B) until such time, if ever, that the co-defendants are all found liable and judgment is recovered from the non-debtor defendants. At that time, pur-

suant to § 502(e)(2) the reimbursement claim is deemed effective as of a pre-petition date.

## II. The Contingent Nature of the Claims for Reimbursement

21. Granite asserts that Movants' claims should be disallowed under 11 U.S.C. § 502(e)(1)(B).[4] This provision provides in part:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on ... the claim of a creditor, to the extent that—
>
> . . . .
>
> (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution. . . .

11 U.S.C. § 502(e)(1)(B). This provision requires that a proof of claim be disallowed when three elements are present: (1) the claim is for reimbursement, (2) the claimant is "liable with the debtor", and (3) the claim is contingent as of the time of its allowance or disallowance. *In re Provincetown–Boston Airlines, Inc.,* 72 B.R. 307, 309 (Bankr. M.D.Fla.1987). *See also In re Charter Co.,* 81 B.R. 644, 646 (M.D.Fla.1987), *aff'd.* 862 F.2d 1500 (11th Cir.1989); *In re Hemingway Transport, Inc.,* 105 B.R. 171, 176–77 (Bankr.D.Mass.1989); *In re Wedtech Corp.,* 85 B.R. 285, 289 (Bankr.S.D.N.Y. 1988).

22. Although contingent rights to payment are included in the definition of "claim", from the debtor's perspective a co-debtor's contingent claim for reimbursement against the debtor is redundant with the direct claim by the creditor against the debtor. The Bankruptcy Code in § 502(e)(1)(B) therefore treats the claim for reimbursement as premature until the creditor's claim against the debtor is allowable and the co-debtor, not the debtor, makes payment to the creditor. One commentator explains:

In recognition of the difference in status of the surety and the debtor's creditor, section 502(e)(1)(B), apparently, but not really in derogation of section 502(c), disallows any claim made by the surety or person secondarily liable with the debtor of any claim for reimbursement or contribution to the extent that that claim is contingent as of the time of allowance or disallowance. A claim of a surety is contingent, in this context, until the surety pays the principal creditor and thereby fixes his own right to payment from the debtor. As section 502(e)(2) is clear that to the extent a claim for reimbursement or contribution by a surety or person secondarily liable is fixed after the commencement of the case, it is held to be a prepetition claim for purpose of allowance. It combines with section 502(e)(1)(B) so that the surety or person secondarily liable as co-debtor with the debtor would be generally permitted a claim for reimbursement or contribution to the extent that the surety or co-debtor has paid the assured party *i.e.,* the debtor's creditor, at the time of the allowance or disallowance of such claim for reimbursement or contribution, even if the payment is made after the commencement of the case. *Accordingly, section 502(e)(1)(B) disallows a contingent claim of the surety for reimbursement or contribution. Such claim is on the other hand, allowed as a prepetition claim at the time it becomes fixed after the commencement of the case, i.e.,* when the creditor's claim against the debtor is paid by the surety or co-debtor.

3 King, *Collier on Bankruptcy* ¶ 502.05[1] at 502–88 (15th ed. 1989) (emphasis added).[5] *See also Charter,* 81 B.R. at 648 (general policy discussion).

23. Each of the three elements of § 502(e)(1)(B) is present here. First, Movants' claims are for reimbursement. To the extent Movants are held to be jointly

---

**4.** Neither Granite nor the Movants develop this argument or specifically address the relationship between § 502(e)(1)(B) and a motion to file a contingent claim for reimbursement after the bar date.

**5.** Although *Collier* speaks of claims by a "co-debtor, surety, or guarantor," courts have universally held that the language "liable with the debtor" is not confined to those who voluntarily incurred joint contractual obligations with the

848

and severally liable with the Pettibone Entities in the Texas PL Action and are required to satisfy a portion of the Reicherts' judgment that exceeds their share of the liability, they seek to recover that amount from the Pettibone Entities. A claim for indemnification, as well as contribution, has been considered to be for "reimbursement" within § 502(e)(1)(B). *Wedtech*, 85 B.R. at 289.

24. Second, Movants are potentially "liable with the debtor." The legislative history speaks of a "co-debtor, surety, or guarantor of an obligation of the debtor." H.Rep. No. 95–595, 95th Cong. 1st Sess. 354 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6310. However, beginning with *In re Baldwin–United Corp.*, 55 B.R. 885, 890 (Bankr.S.D.Ohio 1985), courts have universally rejected any distinction between parties who are jointly liable through voluntary contractual obligations such as surety agreements and joint tortfeasors. *See Provincetown Boston*, 72 B.R. at 309–10. The *Baldwin–United* court explained that "[t]he phrase 'an entity that is liable with the debtor' is broad enough to encompass any type of liability shared with the debtor, whatever its basis. Had Congress intended to limit the section to contractual claims, it could easily have written 'entity that is contractually liable with the debtor.'" 55 B.R. at 890. The Reicherts are asserting that Movants and the named Pettibone Entities are jointly and severally liable for the injuries allegedly incurred in the July 17, 1985 accident. Accordingly, the second element is satisfied.

25. Finally, Movants' claim is contingent as of the time of allowance and/or disallowance. "A contingent claim is by definition a claim which has not yet accrued and which is dependent upon some future event that may never happen." *Provincetown Boston*, 72 B.R. at 310. If as here, an objection to a movant's claim is made on the basis of § 502(e)(1), "the time of allowance or disallowance of such claim" is the time of the ruling on the objection. *Baldwin–United*, 55 B.R. at 894–95. 3 *Collier* objection. *Baldwin–United*, 55

B.R. at 894–95. 3 *Collier* ¶ 502.05[1] at 502–87. Movants' claims have clearly hinged on a future determination that they and the named Pettibone Entities are liable to the Reicherts.

26. Any Conclusions of Law that may be contained in the Findings of Fact will stand as additional Conclusions of Law.

CONCLUSION

Accordingly, although Movants' motion to file their late claims will be granted, such claims will be provisionally disallowed pursuant to § 502(e)(1)(B). At such time if any as such claims cease to be contingent, then Movants under § 502(e)(2) will then be deemed to have filed timely pre-petition claims for reimbursement.

debtor, but rather also includes joint tortfeasors.

See the discussion below.