**In re WHITE FARM EQUIPMENT COMPANY, Debtor.**

**Bankruptcy No. 85 B 7532.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 11, 1989.

See also, Bkrtcy., 63 B.R. 800.

David Newman, U.S. Dept. of Justice, Tax Div., Washington, D.C., for I.R.S.

Karla Schreiber of Holleb & Coff, Chicago, Ill., for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER

JOHN D. SCHWARTZ, Chief Judge.

On September 4, 1980, White Farm Equipment Company ("WFE I") filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code [1] in the United States Bankruptcy Court for the Northern District of Ohio. On that date,

---

1. 11 U.S.C. § 101 *et seq.* All section references are to the Code unless otherwise noted.

an order was entered authorizing the debtor-in-possession to pay pre-petition wages and benefits up to $2,000 per employee for wages earned within the ninety days preceding the commencement of that case. The order directing these payments did not specifically authorize or direct the debtor-in-possession to withhold and pay the withholding and FICA taxes which would ordinarily have been paid to the Internal Revenue Service (IRS) at or shortly after the time of the payment of the wages.

On or about May 12, 1981, the IRS filed a Proof of Claim for these taxes pursuant to § 507(a)(6) (now and hereinafter referred to as § 507(a)(7)). The claim consisted of $339,921.80 for FICA and withholding and $13,493.01 for FUTA taxes together with interest and a penalty up to the filing date. Prior to confirmation of the Plan in WFE I, no payments on this claim were made by WFE I.

On October 31, 1981, the first amended Plan of reorganization of WFE I was confirmed. The Plan contemplated the continued operation of the business of the Debtor by the reorganized Debtor and provided that "[a]ll claims of government units entitled to priority under § 507(a)(6) [§ 507(a)(7)] shall receive deferred cash payments over a six-year period in equal annual installments commencing 90 days after confirmation of the Plan in accordance with the provisions of § 1129(a)(9)(C) of the Bankruptcy Code." It is not clear from the briefs before the court whether any of the amount to be paid under the Plan was paid. It is however clear that most, if not all, was never paid.

On May 20, 1985, an involuntary petition under Chapter 7 was filed against the reorganized WFE I ("WFE II") in the United States Bankruptcy Court in Kansas. This proceeding was transferred to this jurisdiction on June 5, 1985 and converted to a voluntary Chapter 11 case on June 14, 1985.

On September 17, 1986, the IRS filed Claim No. I–17 in the WFE II case for the remaining taxes due to it under the WFE I Plan. The IRS asserts that Claim No. I–17 is entitled to § 507(a)(7) priority status in the WFE II case. The WFE II Unsecured Creditors Committee ("Committee") has filed an objection to Claim No. I–17, arguing that the taxes due are not to be accorded a seventh priority under § 507(a)(7) in the WFE II case, but must be treated as general unsecured claims.

On November 5, 1987, this court entered an order confirming the Third Amended Plan in the WFE II case. This Plan is a plan of liquidation, providing that priority tax claims must be paid in full. The IRS contends that Claim No. I–17 arose from nonpayment of the taxes from the WFE I case and is therefore a priority claim in this case. The Committee contends that the taxes due from WFE I have no priority in the WFE II case.

For the sake of clarity, the court wishes to emphasize that the claim in question in the WFE II case is for the same tax obligations asserted as the claim in the WFE I case § 507(a)(7). The question before the court, therefore, is whether the tax obligations to be paid as provided under § 1129(a)(9)(C) under the WFE I Plan have retained their seventh priority from the first case to the second case or have lost that priority. A secondary question is whether the interest on the tax obligations is also to be accorded priority status in the WFE II case.

The IRS argues that the priority of the claim for these tax obligations, which it calls trust fund taxes, is never lost through the passage of time. The IRS cites the language of § 507(a)(7)(C), which provides seventh priority for "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity." The IRS contends that the language "in whatever capacity", combined with the legislative history of the sections according taxes seventh priority, must lead to the conclusion that the intervening event of a second bankruptcy filing has no effect on that priority in the second case. In other words, if the obligor is obligated in any possible capacity, it remains obligated through reorganization.

The Committee argues that seventh priority has never been applied in back-to-back Chapter 11 cases. The Committee reads the words "in whatever capacity" as limited to an attempt on the part of Congress to reach through the bankrupt corporation to the officers who had had responsibility for the collection of these taxes. The Committee urges the court to regard WFE II as not a continuation or repetition of WFE I, but as a new case with a new debtor and different objectives. As such, the Committee contends, WFE II was not bound to fulfill the WFE I Plan of reorganization except to the extent that the Plan bound all holders of claims. In other words, the WFE I Plan was a contract with all holders of claims, including the IRS, and the failure to perform this obligation to the IRS under the Plan was no more than a breach of that contract. Thus the IRS can make only a general unsecured claim for breach of the obligation in the WFE II case.

---

Neither party has brought to the court's attention any authority or legislative history directly on point and the court has found none. The court is aware of its own precedent in *In re Jartran, Inc.,* 71 B.R. 938 (Bankr.N.D.Ill.1987), aff'd, 87 B.R. 525 (N.D.Ill.1988) and *In re Jartran, Inc.,* 76 B.R. 123 (Bkrtcy.N.D.Ill.1987). That case involved a situation similar to this in that a claim from a preceding case arose in a subsequent case. The argument was made, and rejected by this court, that the claim should retain its priority in the second case. In the first case, the court said:

> ... the court does not consider Jartran II as a continuation of Jartran I, but considers the two as separate cases characterized by different objectives, assets and claims ... *In re Jartran, Inc.,* 71 B.R. at 941.

In the second case, the court said:

> The provisions of a confirmed plan bind all parties whose rights are affected by the plan ... When, as here, substantial operations under a confirmed plan are

followed by a second case, the entity's unpaid liabilities under the first case plan become general unsecured claims in the second case. *In re Jartran, Inc.,* 76 B.R. at 125.

An administrative claim from the first bankruptcy was not allowed to retain its administrative priority in a second bankruptcy. In the court's opinion, these decisions do not apply to the question of whether taxes lose their statutory priority in a second case. The court must decide on the basis of what Congress intended with respect to a continuing priority for taxes previously due from a predecessor entity.

The two White Farm cases are indeed separate cases with different objectives, assets and claims. That does not answer the question before the court because no contention has been made that WFE II owes the taxes as a result of its own tax obligation incurred after confirmation of the WFE I Plan. The question is whether, once a tax priority claim exists, can it be lost or does it retain its priority upon transfer to a succeeding obligor.

The court also adheres to the second statement above, that the provisions of a confirmed plan bind all parties whose rights are affected by the plan. This statement does not answer the question because the government's rights are not affected by the Plan. A plan can only be confirmed if the taxing authority will receive all of what is due to the government under the tax code unless it agrees to a different amount. The only concession made to bankruptcy is that the successor (here the reorganized debtor) may pay on a statutorily-prescribed deferred basis. *See* § 1129(a)(9)(C). The IRS cannot contest a plan if it meets the statutory standard of § 1129 under which the government receives the entire amount of the tax which carries the § 507(a)(7) priority, over a period of time with interest. The taxes in question are covered by § 507(a)(7)(C) and "are to be given priority without any limitation upon the time when they became due".[2] *Rosenow v. State of Illinois Dept.*

---

2. The Committee has correctly pointed out that nondischargeability of taxes under § 523 applies only to individuals. However, the court notes that the Seventh Circuit discussed the lack

*of Revenue,* 715 F.2d 277, 279 (7th Cir. 1983). The obligation and its priority continue past the end of the bankruptcy proceedings.

■ In other words, the liability for the taxes was not created by the plan, is not affected by the plan and is not terminated when the plan terminates. Where a creditor can contest a plan and his rights are affected by the plan, the debt is discharged under the terms of such plan. *See In re Sportpages Corporation,* 101 B.R. 528 (N.D.Ill.1989), affirming such a decision of this court with respect to back-to-back bankruptcy cases. The court, however, considers these tax obligations more similar to a secured lien which is intended to survive bankruptcy unaffected than to an administrative claim which is created only for the purposes of a specific bankruptcy proceeding. *Cf., In re Tarnow,* 749 F.2d 464, 466 (7th Cir.1984). The court therefore rejects direct application of the reasoning in the *Jartran* cases to this issue.

The Committee suggests that the correct interpretation of what appears to be broad language in the Code is in fact intended to be narrow. Section 507(a)(7)(C) prescribes seventh priority for "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity." The Committee argues that the legislative history of this section defines "whatever capacity" as relating only to the liability of those corporate officers responsible for collecting and paying the taxes on behalf of the corporation after the corporation has ceased operating as a corporation. As the court reads the legislative history of those words, this interpretation appears to be correct. S.Rep. 95–1106, p. 16, 95th Cong. 2nd Sess. (1978). *But see, In re Virtual Network Services Corp.,* 98 B.R. 343 (N.D. Ill.1989), on the inadvisability of courts' interpreting legislative history to contradict the plain words of a statute. The court regards this argument as speculative rather than as a basis for its decision.

The Senate Committee apparently regarded this interpretation of the words "whatever capacity" as mandated by the

Supreme Court in *U.S. v. Sotelo,* 436 U.S. 268, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978). In *Sotelo,* the Court held that a corporate officer responsible for collection of taxes on wages was liable for those taxes personally after the corporation filed for bankruptcy. Another corporate officer not responsible for collecting the tax was not liable. The decision states that the Court's purpose was to avoid a discrepancy in responsibility between sole proprietors and corporate officers, not to make any later owner of the corporation responsible for the corporation's taxes. The origin of the legislative use of the words "in whatever capacity", therefore, does not answer the question.

In describing the tax provisions of the Bankruptcy Code, Sen. DeConcini referred to a three-way tension between general creditors whose interest should not be diminished by excessive accumulations of past-due taxes, the debtor's interest in its fresh start, and the tax collector who should not lose taxes he has not had reasonable time to collect. The Code was intended to balance these interests by (1) limiting the periods for and during which the IRS could make its claims, and (2) coordinating priority and nondischargeability provisions on the claims which would be allowed so that priority tax claims were to remain nondischargeable until the amount due as tax was collected.

> In general, the bill retains two important priority rules of present law: first that priority and nondischarge are recognized for tax claims ... and for withheld income taxes and the employee's share of social security taxes (the "trust fund" taxes) receive priority and are nondischargeable regardless of the due date of the return.
>
> Report of Sen. DeConcini, S.Rep. 95–989, 95th Cong.2d sess., p. 14 (1978) U.S. Code Cong. & Admin. News 1978, pp. 5787, 5800.

■ The court reads this explanation as establishing two equal and coordinated rules: both priority and nondischargeabili-

of time limitations separately from the nondis-     chargeability point.

ty survive bankruptcy. The purpose of both is to insure the collection of "taxes due and owing to the government in order to prevent loss of revenues to the United States Treasury." *In the Matter of Avildsen Tools & Machine, Inc.*, 794 F.2d 1248, 1254 n. 10 (7th Cir.1986).

The concessions made to the general creditors are limited to how far back in time the IRS can reach and how quickly the IRS is required to act. These restrictions do not apply to this tax claim because the claim was timely when filed in the WFE I case. The taxes in question are trust fund taxes and therefore the claim can not lose its timeliness due to delay in payment. S.Rep. 95–989, at 14. The obligation to pay the trust fund taxes arose as a liability at the time the wages were paid and "receive priority and are nondischargeable regardless of the due date of the return." *Otte v. United States*, 419 U.S. 43, 55, 95 S.Ct. 247, 255, 42 L.Ed.2d 212 (1974).

The court sees nothing in the Bankruptcy Code or in its legislative history which should be read to permit any intervening event to disturb this articulated balancing of interests. Under the Bankruptcy Code, therefore, the court believes that once the tax priority arose, as of WFE I's payment of wages, no later event, other than the Government's consent, could have the effect of changing that priority.

If the Code is not enough, the court is further of the opinion that the same result can be supported by a two-step analysis. The first question is whether the priority of the taxes changed as a result of being made part of the WFE I Plan, and, second, whether the tax priority changed as a result of the assumption of the taxes as a liability by the reorganized corporation. The answer to the first is a matter of bankruptcy law; the answer to the second is a matter of tax law.

Under bankruptcy law, the WFE I Plan could not have been confirmed unless the obligor under the Plan was required to pay the entire tax claim as provided in § 1129(a)(9)(C). The obligor under the WFE I Plan was the reorganized corporation, WFE II. WFE II remained obligated

to pay the tax claim which never lost its tax priority. Once a tax, always a tax.

Under tax law, WFE II stepped into the shoes of WFE I. A reorganized corporation after bankruptcy is like a successor corporation which receives the assets and assumes the liabilities of the predecessor corporation. As a general rule, a predecessor corporation which transfers its assets to another corporation and agrees to assume the predecessor corporation's debts becomes liable for those debts under transferee liability rules. Mertens, Law of Federal Income Taxation, § 53.18. *See*, for example, *Vulcan Materials Co. v. United States*, 446 F.2d 690, 698–99 (5th Cir.1971). "Transferee liability subjects the property in the hands of the transferee to the debts of the transferor." Mertens, at § 53.07. The liability of a transferee is assessed in the same manner as the liability of the original taxpayer. Mertens, at § 53.06; *Phillips v. Commissioner*, 283 U.S. 589, 592, 51 S.Ct. 608, 609, 75 L.Ed. 1289 (1931). If WFE I was liable for a seventh priority tax claim, then WFE II acquired that exact obligation. When WFE II filed for bankruptcy protection the tax claim it had received from WFE I retained the same priority it had been assigned in the WFE I Plan. A tax is like Gertrude Stein's rose.

---

The parties before the court have not argued the issue of whether interest on the tax obligation should have accrued, how long it should accrue or at what rate, or what priority it should have in the WFE II case. Because it is a substantial part of this claim and because the court must decide this issue, the court will draw the parties' attention to it.

█ Interest runs from the date the taxes in question should have been paid or deposited to the date of the commencement of the WFE II case on May 20, 1985.

The IRS was to receive interest on tax payments which were deferred pursuant to § 1129(a)(9)(C). *Matter of Southern States Motor Inns, Inc.*, 709 F.2d 647, 651 (11th Cir.1983); *In re Arrow Air, Inc.*, 101 B.R. 332 (S.D.Fla.1989). Neither the Plan

nor the order confirming the Plan specified the rate of interest. Courts have interpreted § 1129(a)(9)(C) as requiring that the rate be set so as to make the government whole with respect to the value of its claim at the time of collection. *Id.*, at 651. The court notes that courts have used methods of calculation which refer to statutory interest rates, treasury bill rates and commercial loan rates. *Id.*, at 651. The court further notes that two recent decisions have focussed on prevailing market rates as the most sensible method to make the government whole. *United States v. Neal Pharmacal Co.*, 789 F.2d 1283 (8th Cir. 1986); *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503 (9th Cir.1987). The parties should comment on this issue before a final order.

Interest ceased running as of the filing of the WFE II case. Interest accrued up to that point and is labelled pre-petition interest. In a recent decision, the Seventh Circuit held that pre-petition interest is matured interest which becomes part of the claim and is accorded the same priority as the underlying claim. *Matter of Roger Roy Larson*, 862 F.2d 112, 119 (7th Cir. 1988). Post-petition interest, that is, after the WFE II case commenced, is unmatured interest and is therefore not part of the claim. *Id.*, at 119.

The interest which had accrued prior to the commencement of the WFE II case, at a rate to be decided, is therefore part of the claim in the WFE II case and is to hold the same priority position as the underlying tax claim, which has held its priority as a § 507(a)(7)(C) tax claim from the date it was due and not paid.

The court sets a status on July 31, 1989 at 11:00 a.m. to determine the interest rate to be applied so that a final order may be entered.