**In re SIEBERT TRAILERS, INC., Debtor.**

**SECURITY PACIFIC NATIONAL BANK, a national banking association, Plaintiff,**

v.

**The UNITED STATES of America; Siebert Trailers, Inc., Ernest Siebert and Margaret Siebert, Defendants.**

**Bankruptcy No. 988–02633. Adv. No. 989–0063.**

United States Bankruptcy Court, E.D. California.

Feb. 15, 1991.

---

David F. Levi, U.S. Atty., William C. Hahesy, Asst. U.S. Atty., Fresno, Cal., and Thomas M. Rohall, Sp. Asst. U.S. Atty., Sacramento, Cal., for the U.S.

Bennett G. Young, San Francisco, Cal., for Sec. Pacific Nat. Bank.

Steven Altman, Modesto, for Ernest and Margaret Siebert.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOSEPH W. HEDRICK, Jr., Bankruptcy Judge.

THE COURT, in accordance with the Order Granting Motion for Summary Judgment, which is simultaneously filed herewith, hereby enters the following Findings of Fact, Conclusions of Law, and Judgment.

The United States, Security Pacific, and Ernest and Margaret Siebert (hereinafter referred to as the Sieberts) filed a Stipulation of Facts and attached exhibits, which facts are incorporated herein by reference and form the basis for the following findings of fact.

## FINDINGS OF FACT

On October 4, 1988 Siebert Trailers Inc. (hereinafter referred to as Trailers or debtor) filed a voluntary chapter 11 petition in the Eastern District of California (Modesto Division).

The Service contends that the debtor owes the Service $1,785,597.51 as of the petition date. On July 27, 1988, August 1, 1988, August 22, 1988, and September 1, 1988, the Service filed notices of federal tax liens.

The Sieberts contend that the debtor owes $949,500 as of the petition date. The Sieberts' debt is secured by the filing of a financing statement on May 22, 1986; but neither the security agreement, nor the financing statement provide that the debt is secured by "general intangibles."

Security Pacific has filed several proofs of claim for different loans; however, only two such loans were secured by "general intangibles."

The debtor was a fiscal year taxpayer with its fiscal year ending on October 31 of each year. On July 22, 1988 the debtor and BBR Distributors, Inc. filed a consolidated return for the fiscal year ended October 31, 1987 and said return showed a net operating loss of $599,807.

On August 29, 1988 the debtor filed with the Collection Division of the Service, Stockton, California two form 1139s "Application for Tentative Refund." The form 1139s were received in the Ogden Service Center on September 29, 1988. The applications for tentative refund sought to carryback the net operating loss incurred by the debtor for its consolidated year ended October 31, 1987. The amounts sought to be carried back are as follows:

| Carryback Year | Amount | NOL | ITC |
|---|---|---|---|
| Oct. 31, 1984 | $16,981 | yes | |
| Oct. 31, 1985 | 69,832 | yes | |
| April 30, 1986 | 4,591 | yes | |
| Oct. 31, 1983 | 126 | | yes |
| Oct. 31, 1981 | 3,704 | | yes |
| Total | $95,234 | | |

On November 14, 1988 and December 1, 1988 the Service accepted as filed the forms 1139.

On October 6, 1988 Trailers filed a Motion for Permission to Use Cash Collateral, in which the debtor sought authority to use cash collateral on an interim basis. The Sieberts opposed the Motion. Neither the Service nor Security Pacific filed any opposition or appeared at the hearing. The Court, by Order entered on October 18, 1988 authorized the Debtor to use cash collateral on an interim basis through October 31, 1988. A continued hearing on the use of cash collateral was scheduled for November 1, 1988.

At the November 1, 1988 hearing, neither Security Pacific, nor the Service opposed the Debtor's continued use of cash collateral. The Sieberts, however, filed an opposition. Following the hearing, the Court authorized the Debtor to use cash collateral through January 31, 1989 and set a continued hearing date for January 25, 1989.

On or about January 19, 1989 the Service filed an objection to the Continued Use of Cash Collateral. Prior to the January 25, 1989 hearing the debtor and the Service agreed to allow the debtor to continue to use cash collateral in exchange for the debtor allowing the Service to offset a tentative refund of $95,234.00 against the prepetition tax debt due the Service.

On February 10, 1989 the Sieberts filed an objection to the Service's Stipulation. On February 21, 1989 Security Pacific filed an objection to the Service's Stipulation.

On January 13, 1989 and January 20, 1989, respectively, Security Pacific and the Sieberts filed an opposition to the debtor's continued use of cash collateral. A hearing on the objections to the Service's proposed stipulation was set for March 7, 1989.

At that time the parties entered into a Stipulation, which Stipulation provided that the Service would be allowed to offset the tentative refund against the prepetition tax liability subject however, to the rights of the Sieberts and Security Pacific to file an adversary proceeding to determine if the Sieberts or Security Pacific have a superior security interest in the tentative refund. The present adversary proceeding was the result of the above stipulation and the adversary proceeding was filed timely.

On March 28, 1989, a Stipulation and Order Re Use of Cash Collateral was filed with the Court by which Security Pacific and the Sieberts stipulated to the Debtor's use of cash collateral during the period February 1, 1989 through February 28, 1989.

On April 12, 1989, a further Stipulation Re Use of Cash Collateral by and among the Debtor, Security Pacific, and the Sieberts was filed with the Court. On July 20, 1989, following notice as provided in Bankruptcy Rule 4001(d), the Court entered its Order Approving Stipulation for Use of Cash Collateral.

The cash collateral stipulations between Security Pacific, the Sieberts and the debtor generally provide that the respective secured creditors will retain their prepetition liens on post-petition assets to the same extent and priority that their liens attached pre-petition.

## CONCLUSIONS OF LAW

The Service argued on brief that neither Security Pacific, nor the Sieberts had a superior interest in the tentative refund based upon three rationales. First the Service argued that neither security interest was perfected in accordance with the Anti–Assignment Act, 31 U.S.C. § 3727 which provides that the assignment of a claim against the United States can only be accomplished if all of the following conditions are met:

1. The assignment can only be made after the claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

2. The assignment must specify the warrant, must be made freely and must be attested to by 2 witnesses.

3. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment.

4. The certificate shall state that the official completely explained the assignment when it was acknowledged. 31 U.S.C. § 3727(b).

The second argument made by the Service was that the tentative refund did not come into existence for purposes of determining the priority of the Sieberts' or Security Pacific's lien *vis a' vis* the Service's lien until the Service had determined that there was a "refund."

As a consequence, the Service contended that it had priority over the "tentative refund" under 26 U.S.C. § 6323 since the property in question arose after the Service had filed its notices of federal tax liens.

The next argument advanced by the Service was that under I.R.C. §§ 6402 and 6411 the Service never determined that the debtor was entitled to a refund; but, rather the debtor merely had an "overpayment." The Service further contended that the statutory scheme enacted by Congress embodied in sections 6402 and 6411 required that Service to "off-set" the overpayment against any taxes owed by the debtor and that if there was any excess "overpayment," then and only then did the taxpayer have a "refund."

Security Pacific on the other hand disputed the Service's arguments and contended that the tentative refund in question came into existence when the taxable year closed, which in this case would have been October 31, 1987. From this Security Pacific argues that its state law security interest is prior to the Service's liens.

The Sieberts did not file a brief in this case. However, Counsel for the Sieberts appeared at the hearing on the Cross–Motions for Summary Judgment. The Sieberts concede that their security interest does not attach to the tentative refund in question, because their security agreement and financing statement did not provide that the debt was secured by general intangibles.

In order for Security Pacific to prevail in this adversary proceeding, it must prevail on each of the issues raised by the Service. By contrast in order for the Service to prevail, it need only prevail on one of the issues raised. The Court is persuaded that the Service must prevail for the following reasons.

The court is persuaded that the statutory scheme embodied in 26 U.S.C. §§ 6402 and 6411 requires that before the taxpayer obtains any rights in an "overpayment," (and consequently a state law secured creditor right in the taxpayer's interest) the Service must offset the overpayment against any taxes owed by the taxpayer. The taxpayer has a "refund" only to the extent that the other taxes owed are less than the amount of the "overpayment."

If the other taxes owed are less than the overpayment, then and only then does the taxpayer have a "refund" and then and only then does a state law secured creditor's interest attach. The court is mindful that we are dealing with a very unique item of property commonly called a "refund," but more appropriately classified as an obligation of the federal government.

Under I.R.C. § 6402 the Service is given the power to credit any "overpayment" as defined in I.R.C. § 6401 to any other Internal Revenue tax and to "refund" the remainder to the taxpayer. In addition I.R.C. § 6411 provides that the tentative carryback adjustment is not immediately allowable; but, must await a "limited examination" and a determination whether the taxpayer owes any other federal taxes.

Sections 6402 and 6411 define the taxpayer's right in any overpayment (defined under I.R.C. § 6401). Under I.R.C. § 6411 the taxpayer does not have any interest in a tentative refund until the Service completes the examination and determines that no other federal taxes are due. This is likewise the case under I.R.C. § 6402. Only after these two events have occurred does that taxpayer have a "tax refund." *See Bellows v. United States,* 86–2 U.S.T.C. ¶ 9564, 1986 WL 7057 (N.D.Ill. 1986).

As in most areas of federal taxation, the words used in the statutes have very precise meanings and the terms "overpayments," "credits," "tentative refunds," and "refunds," are no exception.

In order for a taxpayer to obtain a refund, the taxpayer must first show that there is an "overpayment" as provided in I.R.C. § 6401. In very simplified terms the

term "overpayment" means any payment made by the taxpayer over and above the tax liability.

Once the overpayment has been established, I.R.C. § 6402 provides what the Service can do with that overpayment. In general terms the Service may "credit" the overpayment to any other liability that the taxpayer may owe, and then the Service may then apply the overpayment to other debts described in section 6402(c) and (d) (past due child support for example).

After these credits have been applied, then and only then does the taxpayer have a "refund." Treas.Reg. § 301.6402–1 provides:

> The Commissioner, within the applicable period of limitations, may credit any overpayment of tax, including interest thereon, against any outstanding liability for any tax ... owed by the person making the overpayment and *the balance, if any, shall be refunded* ... to that person by the Commissioner.

I.R.C. § 6402 is not a mere codification of the common law rule of off-set; but, rather it is a definitional section, which section defines the term refund. The term refund is defined as the excess of the overpayment over the amount of other taxes due. In this case the debtor does not have a "refund." At most the taxpayer has a tentative carryback adjustment pursuant to I.R.C. § 6411.

Section 6411 provides much the same definition of a tentative refund as did section 6402 with respect to a refund. Once the Service has determined that a tentative carryback adjustment is allowable under section 6411(b) the section goes onto describe how the decrease in tax is to be applied.

I.R.C § 6411(b) provides in part:

> ... Such decrease shall be applied against any unpaid amount of the tax decreased ... and any remainder shall be credited against any unsatisfied amount of any tax for the taxable year immediately preceding the taxable year of the net operating loss, net capital loss, or unused business credit the time for payment of which tax is extended under

section 6164. *Any remainder shall, within such 90–day period, be either credited against any tax or installment thereof then due from the taxpayer, or refunded to the taxpayer.*

The taxpayer's interest in the tax obligation is determined by federal statute as is the interest a creditor seeks to obtain in this obligation. The creditors' interest in the obligation can be no better than that of the taxpayer. *Brozan v. United States,* 128 F.Supp. 895, 47 A.F.T.R. 476 (S.D.N.Y.1954).

The Court's conclusion is further supported by *United States v. Cohen,* 389 F.2d 689 (5th Cir.1967) and *Brozan v. United States, supra.* In *Brozan* an attorney for the taxpayer who had successfully sought a tax refund for the taxpayer claimed that his attorney lien was superior to the Service's statutory right of set-off.

The court in *Brozan* specifically held that:

> The claim was at all times subject to the Treasury's statutory right of set-off. As Assignees plaintiffs stand in no better case than did their client who was always, until payment, subject to the Treasury's set-off. Whatever right they acquired was inchoate until the fund due was established by their clients acquittance of any obligation to the United States. 128 F.Supp. at 896, 47 A.F.T.R. at 477.

Security Pacific attempted to distinguish the above case by relying on *United States v. Cohen, supra.* In *Cohen* the dispute concerned whether the award of attorney fees under Federal Tort Claims Act was a direct award of fees to the attorney or more properly characterized as an award to the plaintiff that is impressed with an attorney fee lien. The issue was important in that if the award was a direct award, then barring any sum due the United States by the attorney directly, the United States would have no right to set-off the award against amounts that were due by the taxpayer.

The *Cohen* court concluded that attorney fee awards are not direct awards to the

attorneys; but, rather are awards to the plaintiff that are subject to an attorney lien. Security Pacific attempts to distinguish that *Brozan* case by relying on the language contained in the *Cohen* case to the effect attorney fee awards are derivative of the award given to the plaintiff.

The Court agrees that attorney fees awards are derivative of the rights given to the plaintiff. However, all lien interests are derivative of the rights of the primary claimant. In order for Security Pacific to have an interest in the "overpayment," in question, the taxpayer must have a right to the overpayment. In that sense Security Pacific's right to the fund is derivative. As a consequence, the right, if any, obtained by Security Pacific is subject to the Service's right to set-off prior debts of the debtor.

Given the Court's resolution of the Service's off-set argument, the other arguments made by the Service need not be addressed.

BASED UPON THE FOREGOING, A JUDGMENT IS ENTERED IN FAVOR OF THE UNITED STATES.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

The Cross–Motions for Summary Judgment filed by the United States of America and Security Pacific National Bank came on for hearing on October 23, 1990 after due notice to the parties in interest. Bennett G. Young, Esq. appeared on behalf of plaintiff, Security Pacific National Bank, Steven Altman, Esq. appeared on behalf of Ernest and Margaret Siebert, and Thomas M. Rohall, Special Assistant United States Attorney appeared on behalf of the United States. No appearance was made on behalf of the debtor.

After having considered the evidence presented by the United States, Security Pacific, and Ernest and Margaret Siebert which is contained in a Stipulation of Facts filed by the parties and considering the argument of the respective Counsel, the Court rules as follows:

(1). That there appears to be no genuine issue of material fact, and therefore one of the moving parties is entitled to a judgment as a matter of law;

(2). That Security Pacific's state law security interest in the tax overpayment, which is the subject matter of the present controversy, does not attach to the overpayment until such time as the overpayment ripens into a refund as provided in 26 U.S.C. §§ 6402 and 6411;

(3). That an income tax refund is a "general intangible" for purposes of property classification;

(4). That Ernest and Margaret Siebert's state law security interest did not attach to the property in question because the security agreement and the financing statement filed did not provide that the debt was secured by "general intangibles;"

(5). That the tax overpayment did not ripen into a refund under 26 U.S.C. § 6411 and therefore Security Pacific does not have an interest in the overpayment;

(6). That the United States' Motion for Summary Judgment is granted;

(7). That Security Pacific's Motion for Summary Judgment is denied.

A JUDGMENT WILL BE ENTERED TO REFLECT THE FOREGOING.