**In re PETTIBONE CORPORATION, et al., Debtors.**

**PETTIBONE CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 86 B 1563–71.**
**Adv. No. 91 A 303.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Dec. 28, 1992.

Kevin T. Keating and Nancy M. Hoffman, McDermott Will & Emery, Chicago, IL, for plaintiff.

District Director, I.R.S.; Mayer Silber, Special Asst. U.S. Atty., Chicago, IL; and Charles J. Cannon, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This matter came before the Court for the consolidated trial on objections of Debtor Pettibone Corporation ("Pettibone") to claims filed by the United States Internal Revenue Service (the "IRS"); a motion of the IRS to enlarge the time in which to filed an amended proof of claim; and the Adversary Complaint of Pettibone against the IRS for a declaratory judgment and an order for turnover of an income tax refund allegedly due to Pettibone. Having considered the pleadings, evidence, stipulations, and all other submissions and arguments of counsel, the Court now makes and enters these Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Pettibone and its subsidiaries filed petitions for reorganization under Chapter 11 of the Bankruptcy Code on January 31, 1986. The Court set October 31, 1986 as the bar date for filing proofs of claim.

2. The IRS filed two timely proofs of claims, designated I–22 and I–23, on September 23, 1986, in which it asserted unsecured, priority claims for the following:

| Year | Tax |
| --- | --- |
| 1974 | Corporate Income Tax |
| 1977 | Corporate Income Tax |
| 1978 | Corporate Income Tax |
| 1979 | Corporate Income Tax |
| 1980 | Corporate Income Tax |
| 1983 | FICA and Withholding |
| 1984 | Corporate Income Tax |
| 1985 | Corporate Income Tax and Withholding |
| 1986 | FICA and Withholding |

3. Claim I–22 contained the following statement:

Pettibone Corporation and Subsidiaries is currently being audited for the 8103, 8303, 8403, and 8503 years. A final determination has not been made. It is believed that items being carried forward from prior periods will affect the current examination years. It is possible that issues of significant tax consequences will arise during those same periods now under examination.

IRS Ex. 1.[1] This claim further states that deficiencies in several years had yet to be assessed. *Id.* The IRS claims consistently reflected the fact that the pre-petition tax years of Pettibone were under audit and that the amount of the claims asserted by the IRS were likely to be revised in view of the ongoing audit of those years.

4. Prior to the expiration of the bar date, neither the IRS nor Pettibone knew the ultimate extent of Pettibone's tax liabilities, and continuing efforts by Pettibone and the IRS to fix the amount due were ongoing. *See, e.g.,* IRS Ex. 17 (affidavit of James Schelli, an accountant for Pettibone, outlining the controversy between Pettibone and the IRS).

5. After the claims bar date, the IRS filed five more proofs of claims, designated I–28, I–34, I–35, I–36 I–37, and I–38, between November 3, 1986 and November 25, 1988. Each of these claims stated that it was an amendment to the previously filed proofs of claims. The final proof of claim, I–38, superseded all the prior claims. In it, the IRS asserted that Pettibone owed $5,518,116.49. IRS Ex. 8. This figure was partially based on Pettibone's asserted lia-

---

1. The term "8103, 8303, 8403, and 8503 years" refers to tax years for 1981, 1983, 1984, and 1985.

bility arising under the tax years listed in Claims I–22 and I–23. It was further based on assessments for four other taxable periods, namely Corporate Income tax due from 1976, FUTA due from 1983 and 1986, and Employment taxes due from 8412.

6. Pettibone's Plan of Reorganization was confirmed on December 9, 1988 (the "Plan"). Plan § 2.02 provides for the payment of unsecured tax claims:

> **Unsecured Tax Claims.** Subject to the right of Reorganized Pettibone to prepay allowed Unsecured Claims of governmental units of the kind specified in Code Section 507(a)(7), the holders of such Claims shall receive deferred cash payments over a period not exceeding six years after the date of assessment of such Claims in the full amount of such Allowed Claims, as provided in Code Section 1129(a)(9)(C), plus interest on the unpaid amount thereof at such rate as may be approved by the Bankruptcy Court.

IRS Ex. 13. The Plan did not provide for any secured claim or right of setoff for the IRS. The Confirmation Order provided, in pertinent part:

> 8. Except as otherwise provided in the Plan and in such orders as the Court has entered or may enter approving various settlement agreements in this case, and upon completion of all actions required by the Plan to be taken on or before the Implementation Date, Pettibone shall be discharged from any debt that arose before the date of Confirmation and any debt of a kind specified in sections 502(g), 502(h), or 502(i) of the Code, whether or not (i) proof of the Claim based on such debt is filed or deemed filed under section 501 of the Code, (ii) such Claim is allowed in this Case, or (iii) the holder of such Claim has accepted the Plan.
>
> . . . .
>
> 10. . . . the commencement or continuation of an action, the employment of process, or any act to collect, recover, or offset any such discharged debt as a personal liability of Reorganized Pettibone hereby is expressly enjoined.

Pettibone Ex. 3. Therefore, the Confirmation Order enjoined the IRS from exercising any right of setoff. The IRS did not file any objection to the Plan.

7. For three years after confirmation, Pettibone and the IRS continued to engage in negotiations to finalize Pettibone's prepetition tax liabilities. As a result of these negotiations, the parties stipulated that Pettibone made the following income tax overpayments and underpayments from 1973 to 1985:

| Tax Year | Balance Unadjusted for Carryback Amounts | Carryback Adjustments | Balance Due (overpayments in parentheses) |
|---|---|---|---|
| 1973 | (213,393) | (376,518) | (589,911) |
| 1974 | 1,120,961 | (489,147) | 631,814 |
| 1975 | (99,487) | (609,782) | (706,269) |
| 1976 | (258,972) | 291,007 | 34,013 |
| 1977 | (442,684) | 127,550 | (247,627) |
| | | (127,550) | |
| | | 195,042 | |
| 1978 | 136,219 | 1,671,694 | 1,408,208 |
| | | (399,705) | |
| 1979 | 459,674 | (466,410) | (6,763) |
| 1980 | 256,677 | (2,043,589) | (77,384) |
| | | 1,709,528 | |
| 1981 | (82,235) | | (82,235) |
| 1982 | (106,832) | | (106,832) |
| 1983 | (131,077) | | (131,077) |
| 1984 | (180,596) | | (180,596) |
| 1985 | (3,890) | | (3,890) |

8. The parties have further agreed that Pettibone is entitled to a $396,289 product liability carryback to be applied to its 1978 tax liability.

9. The taxes claimed by the IRS in Claim I–38 that do not relate to years referenced by timely filed Claims I–22 and I–23 total $70,960.

10. The IRS has made claims for unpaid FICA and withholding taxes in the amount of $46,759, excluding interest. However, Pettibone has no records that indicate that these taxes are owed. Aside from this discrepancy, the parties do not dispute the amount of underpayments and overpayments in each year. There is a difference in the method of computing interest accruing from these underpayments and overpayments.

11. The IRS applied the following principles in computing Pettibone's tax liability:

(a) Pettibone's overpayments were allowed interest from the date of the overpayment to the due date of the liability to which the overpayment was applied. When the overpayment occurred after the due date of liability to which it was applied, then no interest was allowed.

(b) The earliest overpayments were continuously offset against the earliest underpayments.

(c) When interest accrued on overpayments, the interest rate was prescribed by 26 U.S.C. §§ 6611 and 6621(a)(1).

(d) When interest accrued on underpayments, the interest rate was prescribed by 26 U.S.C. §§ 6601 and 6621(a)(2).

12. The end result of the IRS calculation was that Pettibone owed $2,379,188.84 in taxes and accrued underpayment interest as of February 1, 1986 (the day after the petition date), and that, if interest accruing from the petition date to June 30, 1992 was added, then Pettibone's liability totals $4,188,358.37. The tax years with underpayments were 1978, 1979, and 1980.

13. Pettibone used different principles to compute its tax liability. It kept overpayments and underpayments on separate tracks and did not employ a continuous offset method. Thus, on overpayments and underpayments, it accrued interest separate and apart from one another. Also in its calculation, overpayments accrued interest post-petition, while underpayments did not. Pettibone presented two alternative calculations to prove its entitlement to a refund. The difference between the two was that the first one (Pettibone Ex. 17) contained no setoffs, while the second one (Pettibone Ex. 18) setoff the underpayments and overpayments and all accrued interest on the confirmation date. Pettibone applied the same interest rates as the IRS to interest accruing on underpayments and overpayments. The result of Pettibone's calculation was that, even including the claims that Pettibone asserts are time-barred, the IRS owes it a refund of $254,054 under the first calculation or $835,782 under the second calculation.

14. This dispute as to how to calculate liability was not settled, and Pettibone filed an objection to the IRS claims on three asserted grounds:

(a) the claims for taxes due during taxable periods that were not asserted in the claims filed before the bar date were barred;

(b) the IRS could not set off the underpayments against the overpayments because the Plan does not grant the IRS such a right, and § 2.02 of the Plan provides that Pettibone may pay unsecured tax claims; and

(c) Pettibone had no records that indicate that it owes the FICA and withholding taxes claimed.

Pettibone therefore asked the court to (i) disallow claims I–22, I–23, I–28, I–34, I–35, I–36, and I–37 in their entirety, (ii) allow claim I–38 in the amount of $14,171,191 with payment to be made in accordance with Plan § 2.02, (iii) determine that Pettibone is entitled to a refund of corporate income tax in the amount of $14,223,703, and (iv) determine interest on any amount

due and owing pursuant to 26 U.S.C. §§ 6611 and 6621.

15. Pettibone subsequently filed the Adversary complaint repeating the allegations made in its objection, and seeking a declaration that Pettibone is entitled to refunds on corporate income taxes for the years 1973 through 1985 in the amount of $15,090,692.45,[2] plus interest from February 28, 1991 until payment, at the rate set forth in 26 U.S.C. 6621, and an order requiring the IRS to immediately turn over such refunds. Alternatively, Pettibone seeks an order requiring the IRS to turn over the amount by which Pettibone's overpayments of corporate income taxes exceed its deficiencies.

16. In response, the IRS filed a motion to enlarge the time within which to file an amended proof of claim by extending the bar date, *nunc pro tunc*, to November 25, 1988 (the date that claim I–38 was filed).

17. Further facts set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal standards set forth in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over Pettibone's Adversary proceeding and its objection to claim, and also over the IRS motion to enlarge time for filing claims pursuant to 28 U.S.C. § 1334(b). These matters are before the Court pursuant to 28 U.S.C. § 157 and Local District Rule 2.33, and they are core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O).

2. Section 505(a)(2)(B) of the Bankruptcy Code, Title 11, U.S.C., authorizes bankruptcy courts to determine debtors' rights to income tax refunds only if a proper request for a refund has been made. *Collier on Bankruptcy*, ¶ 505.04[2] (15th Ed. 1992). Pettibone filed forms 1120X, 870, and 870 AD, all of which constitute proper requests for refunds. *See* 26 C.F.R.

§ 301.6402–3(3) (discussing form 1120X), and Rev.Rul. 68–65, 1968–1 C.D. 555 (discussing form 870). Therefore, Pettibone has made a proper request for a refund, and is entitled to a determination of its right thereto under § 505(a)(2)(B).

### I. *Motion to Enlarge Time for Filing Claims*

■ 3. The first issue to consider is whether to enlarge the time for the IRS to file an amended proof of claim by extending the bar date, *nunc pro tunc*, to November 25, 1988 (the date that the last claim, I–38, was filed). The applicable standards recognized by this Court for determining when to allow the filing of a late claim were set forth in *In re Pettibone Corp.*, 123 B.R. 304, 308 (Bankr.N.D.Ill. 1990):

> Bankruptcy Rule 3003(c)(3) authorizes the bankruptcy court to fix a bar date beyond which proofs of claim are disallowed.... The Bankruptcy Court also has the power under the same rule to extend the date 'for cause shown.' ... In evaluating whether a late claim should be permitted under Rule 3003(c)(3), Bankruptcy Judges in this jurisdiction, as well as other jurisdictions, have considered the following factors: (i) the reason for the delay; (ii) the length of the delay; (iii) whether the debtor was prejudiced by the delay; (iv) the debtor's knowledge of the claim; and (v) the good faith of the creditor.

*See also In re Pettibone Corp.*, 110 B.R. 837, 842 (Bankr.N.D.Ill.1990), and *In re Jartran, Inc.*, 76 B.R. 123, 126 (Bankr. N.D.Ill.1987) (listing the same factors).

4. In this case these factors weigh in favor of extending the bar date. The reason for the delay in filing was a continuing audit of Pettibone's tax liabilities over a period of 13 years. Pettibone's liability for these years was a hotly contested dispute involving many complex issues. The IRS was not dilatory in its actions, and new

**2.** The complaint alleges net overpayments in every year as follows:

| Year | Overpayment | Year | Overpayment |
|------|-------------|------|-------------|
| 1973 | $1,760,976.19 | 1980 | $4,568,851.63 |
| 1974 | 977,517.38 | 1981 | 248,864.97 |
| 1975 | 1,428,008.43 | 1982 | 282,766.10 |
| 1976 | 977,821.87 | 1983 | 284,365.97 |
| 1977 | 2,010,684.45 | 1984 | 360,864.82 |
| 1978 | 893,620.43 | 1985 | 6,538.40 |
| 1979 | 1,289,811.81 | | |

claims were issued as the audit continued and the IRS position developed. Furthermore, Pettibone was made aware of the IRS plan to file future claims from the notice typed on claim I–22 and subsequent claims. *See* Finding of Fact, *supra* at ¶ 3. Pettibone has not presented any evidence to suggest that it was unfairly prejudiced or surprised by this delay. Therefore, the Court shall grant the IRS motion to enlarge the time for it to file its claim.

5. This ruling is further supported by *In re Unroe*, 937 F.2d 346 (7th Cir.1991).[3] In *Unroe*, the IRS filed a proof of claim prior to the bar date for 1982 taxes and penalties. It then filed two proofs of claims after the bar date for 1983 taxes and penalties. The Seventh Circuit held that late filed claims may be allowed either as amendments under Fed.R.Bankr.P. 7015 (Fed.R.Civ.P. 15) or pursuant to the Bankruptcy Court's exercise of equitable discretion under 11 U.S.C. § 105(a). *Id.* at 349. *See also In re Stavriotis*, 977 F.2d 1202 (7th Cir.1992) ("disposition of a motion to amend a proof of claim falls within the sound discretion of the bankruptcy court"). The court further cited *In re Miss Glamour Coat Co., Inc.*, 80–2 U.S.T.C. ¶ 9,737 (S.D.N.Y.1980) for standards to guide this discretion:

1. Whether the debtors and creditors relied upon the Government's earlier proofs of claim or whether they instead had reason to know that subsequent proofs of claim would follow upon completion of audit;

2. Whether the other creditors would receive a windfall to which they are not entitled on the merits by the court not allowing this amendment to the IRS' proof of claim;

3. Whether the IRS intentionally or negligently delayed in the filing the proof of claim stating the amount of taxes due;

4. The justification, if any, for the failure of the IRS to file for a time extension for the submission of further proofs of claim pending an audit; and

5. Whether there are any other considerations that should be taken into account in assuring a just and equitable result.

*Unroe*, 937 F.2d at 350 n. 4. However, the court added this caveat,

Recitation of the *Glamour Coat Co.* factors could, we note, justify nearly any outcome a bankruptcy judge desires. A bankruptcy court's exercise of equity in this context must include identification of factors related to the debtor's notice of a pending claim or excusable neglect by the creditor.

*Id.* at 350 n. 5.

6. In this case, Pettibone clearly knew that further claims were coming from the IRS pending the audit. Indeed, Pettibone was actively involved in the dispute over its tax liability long after the bar date had expired. There is no evidence to suggest that other creditors would be prejudiced. Furthermore, all but a tiny portion of the taxes claimed in I–38 related to taxable periods discussed in claims filed prior to the bar date. Therefore, applying the *Miss Glamour Coat* factors to this case also yields the conclusion that equity weighs in favor of allowing the IRS to file its late claim.

## II. *Whether Pettibone is Entitled to a Refund*

7. Pettibone's Plan and Confirmation Order describe how IRS claims are to be treated. See Pettibone Ex. 1, Plan § 2.02, and Pettibone Ex. 3, Confirmation Order, ¶¶ E and 8(b). Plan § 2.02 calls for the full amount of unsecured tax claims to be paid in accordance with 11 U.S.C. § 1129(a)(9)(C). Thus, the Plan provides that Pettibone and the IRS shall determine by agreement and/or litigation what payment or refund is owed; and if Pettibone

---

**3.** *Unroe* is not direct precedent in this case because it discussed bar dates in Chapter 13 cases. The operative provisions governing the extensions of bar dates in Chapter 13 cases are Fed. R.Bankr.P. 3002(c) and 9006(b)(3). In Chapter 11 cases, however, the operative provision is Fed.R.Bankr.P. 3003(c). There is concern that *Unroe* failed to discuss or account for Rule 9006(b)(3). However, this concern need only be addressed when the issue arises in a Chapter 7 or 13 case governed by Rules 3002(c) and 9006(b)(3).

owes the IRS any taxes, then it shall pay (in installments over the course of six years) the full value of such claim as of the effective date of the Plan (December 28, 1988). The Plan does not provide for the IRS to be paid as a secured creditor. Furthermore, the Confirmation Order prohibits parties from exercising any rights of setoff against discharged debts except as provided in the Plan.

■ 8. Pettibone argues that adopting the IRS computation of taxes would be tantamount to allowing the IRS to exercise a setoff pursuant to 11 U.S.C. § 553, which violates the Plan and Confirmation Order. Section 553(a) provides, in relevant part,

> ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case
>
> . . . .

11 U.S.C. § 553(a). Discussing this section, the Seventh Circuit stated, "[§ 553] recognizes that the creditor who owes his debtor money is like a secured creditor; indeed, the mutual debts, to the extent equal, secured each party against the other's default." *Matter of Elcona Homes Corp.*, 863 F.2d 483, 485 (7th Cir.1988). To come within the purview of § 553 the debts sought to be setoff must be mutual, which means that the debts must be in the same right and between the same parties, standing in the same capacity. *In re Lakeside Community Hospital, Inc.*, 139 B.R. 886, 889 (Bankr.N.D.Ill.1992); *In re Martin*, 130 B.R. 930, 939–40 (Bankr.N.D.Ill.1991) (and cases cited therein).

■ 9. In this case, there is no mutuality because the right of Pettibone to receive its overpayments is not in the same right as the right of the IRS to receive payment of what is due as a result of underpayments. This conclusion is based on the distinction between overpayments and refunds. An "overpayment" is defined as "any payment made by the taxpayer over and above the tax liability." *Steiner v.*

*Nelson*, 309 F.2d 19, 21 (7th Cir.1962); *In re Siebert Trailers, Inc.*, 132 B.R. 37, 41 (Bankr.E.D.Cal.1991). It is distinguishable from a "refund" which is an obligation of the IRS to pay the taxpayer an overpayment. *Id.; Bellows v. United States*, 86–2 U.S.T.C. ¶ 9564 (N.D.Ill.1986).

10. Section 6402 of the Internal Revenue Code ("I.R.C.") governs when an overpayment becomes a refund. It provides, in relevant part,

> (a) **General rule.**—In the case of any overpayment, the Secretary or his delegate ... may credit the amount of such overpayment, including interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall ... refund any balance to such person.

26 U.S.C. § 6402(a). *See also* 26 U.S.C. § 6411 (which allows taxpayers to apply for adjustments to previous tax periods based on net operating loss carrybacks or other credits and provides that overpayments are to be applied to unpaid taxes due in years related to the overpayments).

11. The IRS has promulgated a rule to implement I.R.C. § 6402(a) which provides, in relevant part, that the IRS "may credit any overpayment of tax, including interest thereon, against any outstanding liability for any tax ... owed by the person making the overpayment and the balance, if any, shall be refunded...." Treas.Reg. § 301.-6402–1.

12. It is clear from the language of I.R.C. § 6402(a) and Treas.Reg. § 301.-6402–1 that § 6402 is a definitional section. *Siebert Trailers*, 132 B.R. at 41. In other words, it defines the right to a refund to be what a taxpayer is owed after the IRS has exercised its discretion to credit an overpayment against liability for other underpayments. Therefore, an overpayment does not necessarily create a debt due to the taxpayer because that entity has no right to its overpayment until after the IRS has exercised its discretionary powers under I.R.C. § 6402(a) and Treas.Reg. § 301.-6402–1.

13. Other courts interpreting I.R.C. § 6402 have reached the same conclusion. In *Bellows v. United States*, 86–2 U.S.T.C. ¶ 9564, the administrator of a probate estate filed suit in district court to recover an overpayment paid by the decedent in 1979 but credited against taxes due in 1977 by the IRS. The administrator argued that the IRS wrongfully exercised its right of setoff because creditors with higher priority were present. The district court rejected this argument and dismissed the suit finding that pursuant to I.R.C. § 6402(a), the taxpayer (and thus, the administrator) only had a right to the amount of overpayment that was in excess of the underpayment. Since there was no such excess, the court found that the overpayment never became an asset of the estate.

Likewise, in *Estate of Bender v. Commissioner of Internal Revenue Service*, 827 F.2d 884 (3rd Cir.1987), a decedent had overpaid taxes in three years and underpaid taxes in four other years. When filing a federal estate tax return, the executrix of the decedent's estate treated the overpayments as an asset of the estate separate and apart from the liabilities arising out of the underpayments. The Third Circuit found that overpayments could not be treated as assets stating,

> Under 26 U.S.C. § 6402(a), the discretionary power to offset the Testator's net annual overpayments against his net annual liabilities from other years rests exclusively with the IRS. The Testator did not have an affirmative right to compel the IRS to issue a refund for those years in which he had overpaid his taxes. Any hope that the Testator may have had that his overpayments would be refunded rather than offset against his liabilities, therefore, was a mere expectancy that did not rise to the level of a property interest.... We are not persuaded that it is reasonable for a taxpayer to assume that he will receive an income tax refund from the IRS when he has a net income tax liability in his overall account, particularly when the published policy of the IRS states that offsets are applied as a matter of course.

827 F.2d at 887.

14. The IRS is undoubtedly entitled to receive what is due as a result of an underpayment. Pettibone, on the other hand, is not entitled to receive overpayments. It can only look to a possibility that the IRS may exercise its discretion under I.R.C. § 6402(a) to refund the overpayments rather than credit them against underpayments. Thus, there is no mutuality and consequently, no setoff within the purview of § 553 of the Bankruptcy Code.[4]

15. This leads to the conclusion that the continuous offset method employed by the IRS is consistent with the Bankruptcy and Internal Revenue Codes, and that the IRS had an unsecured claim for $2,379,188.84 in taxes and accrued underpayment interest as of the bankruptcy petition date. *Supp.Stipulation*, ¶ 2.

16. There are precedents finding that crediting overpayments against liability for underpayments constitutes a § 553 setoff. However, these cases are distinguishable. For example, in *In re Rozel Industries, Inc.*, 120 B.R. 944 (Bankr.N.D.Ill.1990), the court found that the IRS had the right under § 553 to setoff overpayments against liability for underpayments. *Id.* at 948–55. However, that debtor and the IRS stipulated that "debtor is entitled to a refund" plus accrued interest for one tax year and that the IRS could set off a part of that refund against certain other IRS claims. *Id.* at 947. Refunds grant taxpayers substantively different rights than mere overpayments.

17. In *United States ex rel. I.R.S. v. Norton*, 717 F.2d 767 (3rd Cir.1983), the court found that retaining the debtor's tax

---

**4.** The IRS argued that § 31(59) of the IRS Manual directs employees to use their offset method. However, despite requests from the Court (by calls from the law clerk to the parties), government counsel did not produce this portion of the Manual at trial or in post-trial briefings because they maintain that it is a "classified" document. Pettibone was never able to test the veracity or context of the argument based on the cited § 31(59) because of IRS failure to produce it. The government cannot rely on secret manuals as if they are published regulations. Therefore, the Court has disregarded the IRS arguments regarding the Manual provision.

refund due post-petition as security for payment of the debtor's pre-petition tax liabilities violated the automatic stay imposed by 11 U.S.C. § 362. However, the mutuality of debts was assumed and not analyzed by the opinion. Furthermore, the IRS was attempting there to offset a refund due on a post-petition overpayment against a pre-petition liability, a situation not presented here.

18. The IRS argues that even if its calculation method is a § 553 setoff, then it would still be allowable under the Bankruptcy Code because the right of setoff under § 553 would survive confirmation of Debtor's Plan notwithstanding 11 U.S.C. § 1141. Section 1141(a) provides that, "the provisions of a confirmed plan bind the debtor ... and any creditor...." 11 U.S.C. § 1141(a). However, § 553(a) states that the other provisions of the Bankruptcy Code "[do] not affect any right of a creditor to offset a mutual debt." The Ninth Circuit examined these two provisions and the language, context, and history of § 553. That Circuit held that § 553 "must take precedence over section 1141." *In re DeLaurentiis Entertainment Group, Inc.*, 963 F.2d 1269, 1276 (9th Cir.), *cert. denied sub nom., Carolco Television Inc. v. National Broadcasting Co.*, — U.S. —, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992). While the reasoning in *DeLaurentiis* is persuasive, the Court need not reach this issue because of its holding above that the IRS calculation method is not a § 553 setoff.[5]

### III. *Post–Petition Interest*

■ 19. The IRS also asserts a claim for post-petition interest on its claim accruing at the rate prescribed by I.R.C. § 6621(a)(2). Since the IRS holds an unsecured claim, there is no basis for awarding interest from the petition date to the date of the assessment. However, the IRS is entitled under the Plan to interest so that it receives the present value of its claim as of the effective date of the Plan. 11 U.S.C. § 1129(a)(9)(C). *See also Matter of Burgess Wholesale Mfg. Opticians, Inc.*, 721 F.2d 1146 (7th Cir.1983). In other words, the Plan, in conformity with § 1129(a)(9)(C), requires Debtor to pay interest on the claim to "make the government whole" with respect to the value of its claim as of the effective date of the Plan.[6] *In re White Farm Equipment Co.*, 103 B.R. 177, 182 (Bankr.N.D.Ill.1989).

■ 20. Several circuits have interpreted § 1129(a)(9)(C) as requiring debtors to pay the government the prevailing market rate of interest to make the government whole. *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir.1987); *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1285 (8th Cir.1986); *In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 651 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). Furthermore, the rate mandated by § 1129(a)(9)(C) is not *per se* equal to the underpayment rate set by 26 U.S.C. § 6621(a)(2) because the § 6621(a)(2) rate does not necessarily reflect the prevailing market rate. *Camino Real*, 818 F.2d at 1507.

■ 21. The parties stipulated that the interest accrued on the government's claim accrued from December 28, 1988 to June 30, 1992 in the amount of $1,171,831.23. *Supp.Stip.*, ¶ 2. The Court accepts the interest rate used by the parties as the proper rate under § 1129(a)(9)(C). *Cf. Southern States Motor Inns*, 709 F.2d at 653 (accepting the agreed-upon rate for § 1129(a)(9)(C) purposes). Pettibone is

---

**5.** The IRS exercise of § 553 setoff rights would also be consistent with the Confirmation Order. Since the Plan calls for Pettibone to determine its liability to the IRS and then pay the full amount of that liability, the IRS claim has not been discharged. The Confirmation Order merely prohibits setoffs of discharged debts. Pettibone Ex. 3. Therefore, the Confirmation Order does not prohibit the IRS from exercise any setoffs with regard to its tax claims.

**6.** 11 U.S.C. § 1129(a)(9)(C) provides that the holder of an unsecured priority tax claim "will receive on account of such claim deferred cash payments over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the amount of such claim."

obliged to pay the IRS at the same interest rate until this claim is fully paid.

CONCLUSION

Accordingly, Pettibone's objections to the claims filed by the IRS are overruled, the Motion of the IRS to enlarge the time to file an amended proof of claim until November 25, 1988 is granted, and judgment will be entered in favor of the United States in the Adversary Complaint filed by Pettibone. The Internal Revenue Service will be adjudged to have an allowed claim in the amount of $3,551,020.07 plus interest accruing from June 30, 1992 onwards at the agreed-upon rate. Pettibone will be ordered to pay that claim in accordance with ¶ 2.02 of its Plan of Reorganization.

At the close of Pettibone's case, the IRS moved for a directed finding on all issues of its claim. The Court then reserved ruling on this motion. In light of the Findings and Conclusions being entered, this motion is denied.